E-FILED
Friday, 13 January, 2017  10:30:47 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

KENNETH RUTHERFORD,

           Plaintiff,

v.

PEORIA PUBLIC SCHOOLS
DISTRICT 150,

           Defendant.

Case No. 1:14-cv-01024-SLD-JEH

ORDER

      Plaintiff Kenneth Rutherford filed suit against Defendant Peoria Public Schools District 150 ("the District"), alleging a violation of the Family and Medical Leave Act of 1993 ("FMLA" or "the Act").  Before the Court are Plaintiff's Motion for Partial Summary Judgment, ECF No. 19, and Defendant's Motion for Summary Judgment, ECF No. 21.[1]  For the following reasons, Plaintiff's motion is GRANTED and Defendant's motion is DENIED.

## BACKGROUND[2]

      On November 24, 2010, Kenneth Rutherford sustained injuries to his neck, back, and Achilles tendon when a painting scaffold fell and landed on him while he was working. Rutherford, then the head custodian at Lincoln Middle School in the District, reported the incident to his supervisor, Dave Meyers.  Meyers instructed Rutherford to attend an evaluation at the Illinois Work Injury Resource Center ("IWIRC"), which is the District's preferred health care provider for employee medical evaluations.  Pl.'s UMF ¶ 51.  Dr. Hauter at IWIRC released

---

[1] The Court also GRANTS Defendant's unopposed Motion for Leave to File Amended Exhibit to Motion for Summary Judgment, ECF No. 76.
[2] Undisputed facts taken from Defendant's Memorandum in Support of its Motion for Summary Judgment are identified as "Def.'s UMF."  Undisputed facts taken from Plaintiff's Memorandum in Support of its Motion for Partial Summary Judgment, ECF No. 20, and Plaintiff's Response to Defendant's Motion, ECF No. 77, are identified respectively as "Pl.'s UMF" and "Pl.'s Resp. UMF" Pl.'s Mem. Supp.  Mot. Summ. J. ("Pl.'s Mem. Supp.") 12, ECF No. 20.

Rutherford without restriction.  Nov. 24, 2010 IWIRC Visit Note, ECF No. 35.  However,
Rutherford subsequently developed back pain and began to attend various chiropractic and
physical therapy sessions.  In January 2011, Rutherford saw Dr. Richard Kube, who found that
Rutherford had degenerative changes in his spine, and prescribed an epidural injection and
additional physical therapy.  Pl.'s Aff. ¶ 12, ECF No. 20-1.

On March 15, 2011, Dr. Kube restricted Rutherford to sedentary activity.  Mar. 15, 2011
Work Status Sheet, ECF No. 20-3 at 58.  On March 29, 2011, Dr. Kube gave Rutherford a work
status sheet that diagnosed Rutherford with lumbago.  Mar. 29, 2011 Work Status Sheet, ECF
No. 20-3 at 59.  Dr. Kube checked a box indicating that Rutherford could safely perform at a
"Moderate Activity" level, specifying that he could "frequently lift 35 [pounds] and limited
lifting 50 [pounds], occasional overhead and floor to waist, occasional bending and twisting as
well as prolonged sitting or standing."  *Id.*  Rutherford continued working normally until March
31, 2011, when he delivered Dr. Kube's note detailing these new restrictions to Meyers.  Def.'s
UMF ¶ 41.  Notably, at all relevant times, Rutherford's custodial position required that he be
able to lift at least 50 pounds.  Custodian Qualifications, ECF No. 29 at 4; Pl.'s Resp. UMF ¶ 2.
Meyers told Rutherford that he could not work for the District until he was released to work
without any restrictions.  Pl.'s UMF ¶ 76.

Responsibility for handling FMLA issues belonged to the District's Human Resources
department.  Pl.'s UMF ¶ 33.  From 2010 until June 30, 2012, Teri Dunn was the Director of
Human Resources for the District.  Pl.'s Resp. UMF ¶ 13.  Gerilyn Hammer served as Director
of Employee Services starting in 2004, and in September 2012, upon Dunn's retirement, took
over the Director of Human Resources position.  *Id.* at ¶ 12, 25.  At all relevant times, Janet
Ogden was one of five Human Resources Specialists supervised by Dunn, and was assigned

custodians as an employee group. *Id.* at ¶ 19–21. Cheryl Stenstrom, of Sedgwick Claims, was a third-party administrator of Worker's Compensation Claims for the District. *Id.* at ¶ 30. When Dunn's tenure began in the Human Resources department, the District did not have a system for coordinating absence notifications between an employee's supervisor or payroll, and Human Resources, for the purposes of assessing eligibility for FMLA or other alternative leave absence. Def.'s UMF ¶ 16. The default status was sick leave. *Id.* The District did not provide Rutherford with any leave designation notices or notices of fitness-for-duty requirements. Def.'s Resp. Requests to Admit ¶¶ 31, 33, ECF No. 20-3 at 43-44; Def.'s Mem. Opp. Pl.'s Mot. Summ. J 41, ECF No. 78. Both parties agree that Rutherford's FMLA leave, had it been designated, would have begun on April 1, 2011 and ended on June 23, 2011. Pl.'s Resp. UMF ¶ 51. In her deposition, Dunn stated that Rutherford's leave was treated as if it were designated as FMLA leave. Dunn Dep. 63:14–16, ECF No. 32.

On May 31, 2011, Rutherford again met with Dr. Kube, who indicated in a separate work status sheet that Rutherford could lift "50-100 [pounds] max." May 31, 2011 Work Status Sheet, ECF No. 20-3 at 61. Rutherford had also been cleared for full duty with the ability to lift over fifty pounds in a separate Functional Capacity Evaluation on May 24, 2011. FCE Report, ECF No. 20-3 at 117–18. Rutherford represents that on June 2, 2011, he gave Dr. Kube's note to both Meyers and the District's Human Resources office—specifically, that he handed the note to Janet Ogden and Meyers' secretary and said that he was turning in his paperwork and was ready to return to work. Pl.'s Dep. 47:4–12; 47:23–48:11, ECF No. 24. The District disputes this because Ogden did not recall when she spoke with Rutherford.[3] Ogden Dep. 36:5–17, ECF No. 33. Rutherford also claims to have made numerous phone calls to the District in June and July 2011, seeking to be returned to work. Pl.'s Dep. 57–58. Additionally, Rutherford contacted his

---

[3] Dunn states in her affidavit that the District did not receive Dr. Kube's note until August 10, 2011. Dunn Aff. ¶ 17.

union steward to tell him that he wished to return to work.  *Id.* 50:8–23.  On July 20, 2011,

Rutherford filed a union grievance directly with Meyers, expressing his desire to return to work.

Grievance, ECF No. 48.

Dunn emailed Ogden and Hammer on August 9, 2011 to direct Ogden to schedule a

fitness-for-duty evaluation.  ECF No. 55.  Rutherford met with Dr. Dru Hauter on August 18,

2011.  Aug. 18, 2011 IWIRC Report, ECF No. 56.  No functional capacity test was performed,

which Dr. Hauter attributed to Rutherford's "pain" on his report.  *Id.*  Dr. Hauter found that

Rutherford should be limited to a fifty-pound maximum, and was "not safe to return to work"

without modifications.  *Id.*  Rutherford attended a third full medical evaluation on September 8,

2011.  Rutherford Aff. ¶ 20.  Dr. Gunnar Andersson concluded that Rutherford was "capable of

working without restrictions."  Dr. Andersson Independent Medical Examination, ECF No. 58.[4]

Hammer received the results of Dr. Andersson's examination by email on September 29 and 30,

2011. Def.'s UMF ¶ 70.

On June 27, 2012, Rutherford sent an email to the District's Human Resources

department stating, "It has been a year since my release [from my doctor's restrictions] and I

haven't received any correspondence from the district as to when I can return to work. Please let

me know if there's anything you need from me as I am eagerly awaiting my return to work date."

Jun. 27, 2012 Pl.'s Email to Dunn and Ogden, ECF No. 67.  There is no evidence that the

District ever responded to that email or Rutherford's July 17, 2012 follow-up email.

---

[4] Whether the District instigated the third doctor visit with Dr. Andersson is unclear: Rutherford claims that he attended at the District's behest, but the District argues that the visit was required by Stenstrom as third party administrator of the District's worker's compensation claims.  Def.'s Reply 7. Defendant presented a contrary argument when it was defending Rutherford's Americans with Disabilities Act claim before the Equal Employment Opportunity Commission ("EEOC").  In its Position Statement, the District stated clearly that it requested the independent medical evaluation to reconcile the conflicting evaluations from May and August.  District's EEOC Position Statement 3, ECF No. 20-4 at 27.

In January 2013, Ogden noted that Rutherford stopped by the Human Resources office on January 11, 2013 and inquired about returning to work.  Ogden Dep. 37:12–17; Ogden Dep. Ex. 32, ECF No. 20-2 at 614.  Dunn advised Ogden not to speak to him because he had an attorney. *Id.*  Hammer and Ogden discussed Rutherford's employment status via email on April 23, 2013. Hammer Dep. 67:22–68:10, ECF No. 31.  Hammer described his status as she understood it at that point in time as "still qualified as an employee but . . . never terminated . . . with a board action."  *Id.* at 68.  She stated in her deposition that she did not know why he had not been brought back to work at that point.  *Id.*  Nor did she direct any of the human resource specialists to inquire further into why Rutherford had not returned to work.  *Id.* at 70:22–71:8.  On July 18, 2013, Rutherford sent another email to the District seeking reinstatement.  Hammer Ltr to Pl., ECF No. 20-3 at 27.  In a letter sent on July 30, 2013,[5] Hammer responded, "It is the District's position that you abandoned your job, because you failed to contact the District in a reasonably timely manner regarding any request to return to work."  *Id.*  Rutherford was officially released effective July 13, 2013 at the August 12, 2013 school board meeting.   School Board Proceedings, ECF No. 20-4 at 82.

Rutherford now brings the instant claim for interference under the FMLA, seeking an injunction reinstating him to his former position as well as damages, liquidated damages, prejudgment interests, costs, and attorneys' fees.  Compl. ¶ 72, ECF No. 1.

### DISCUSSION

Rutherford argues that the District violated his rights under the FMLA by failing to provide required notices, failing to reinstate him to his former position as early as June 2, 2011,

---

[5] The letter itself is undated, but Hammer's email correspondence indicates that it was mailed on July 30, 2013. Aug. 7, 2013 Email to Super. Grenita Latham, ECF No. 20-3 at 25.

and forcing him to take more leave than was necessary.[6]  Pl.'s Mem. Supp. 32–43.  The District

argues, as a threshold matter, that Rutherford's claim is untimely.  Def.'s Mem. Supp. Mot.

Summ. J. ("Def.'s Mem. Supp.") 22–24, ECF No. 22.  The District further argues that

Rutherford was not able to perform the essential functions of his job, and was therefore not

entitled to reinstatement, *id*. 24–30; it finally claims that Rutherford was not prejudiced by the

District's failure to designate his leave as FMLA leave because of other benefits he was

provided, *id*. 31.

### I.    Legal Standard on a Motion for Summary Judgment

At the summary judgment stage the court's function is not "to weigh the evidence and

determine the truth of the matter, but to determine whether there is a genuine issue for trial[—

that is, whether] there is sufficient evidence favoring the non-moving party for a jury to return a

verdict" in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate

Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997).  The court must view the evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in that party's favor.

*McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S.

at 255).

When both parties file motions for summary judgment, the court must look to the burden

of proof that each party would bear on the issue at trial.  *Santaella v. Metro. Life Ins. Co.*, 123

F.3d 456, 461 (7th Cir. 1997).  Each party must "go beyond the pleadings and affirmatively . . .

establish a genuine issue of material fact."  *Id.*  Cross-motions are reviewed "construing all facts,

and drawing all reasonable inferences from those facts, in favor of the non-moving party."

---

[6] The parties do not dispute that the District was covered by the FMLA, that Rutherford was eligible for FMLA protections as of March 31, 2011, and that he provided appropriate notice to the District. Def.'s Mem. Supp. 19.

*Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (quoting *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008)).

## I. FMLA Interference Claim

### a. Legal Standard

The FMLA entitles an eligible employee up to twelve work weeks of leave during a twelve-month period where the employee has a serious health condition that renders him unable to perform the functions of his position.  29 U.S.C. § 2612(a)(1)(D).  The Act makes it unlawful for an employer "to interfere with, restrain, or deny the exercise" of a right created by the FMLA.  *Id.* at § 2615(a)(1).  An FMLA interference claim requires only that an employee "show that his employer deprived him of an FMLA entitlement; no finding of ill intent is required." *Burnett v. LFW*, Inc., 472 F.3d 471, 477 (7th Cir. 2006).  Specifically, an employee must show:

> (1) he was eligible for the FMLA's protections,  (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled.

*Burnett*, 472 F.3d at 477.  An employer's failure to comply with either the statutory or regulatory requirements of the FMLA constitutes interference, 29 C.F.R. § 825.220(b), if the employee can show "some impairment of his rights and resulting prejudice."  *Barrett. v. Ill. Dept. of Corr.*, 803 F.3d 893, 898 (7th Cir. 2016) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002)).  An employer who violates § 2615 shall be liable for "wages, salary, employment benefits or other compensation denied or lost . . . by reason of the violation."  29 U.S.C. § 2617(a)(1)(A)(i)(I).

The FMLA and its implementing regulations require employers to advise employees of their rights under the Act by:  (1) posting a general notice of FMLA information and procedures in the workplace, (2) providing an "eligibility notice" to an employee notifying him of his

eligibility to take FMLA leave when the employer acquires knowledge that he may qualify, (3) providing a "rights and responsibilities notice" to an employee with written notice of his obligations and the consequences of failing to meet them, and (4) providing a "designation notice" to an employee notifying him that his leave has been designated as FMLA leave and providing the terms of the leave.  29 C.F.R. § 825.300(a)–(d).  While general notice can be conveyed by advising the general workplace population, the FMLA requires that the other forms of notice be provided on an individualized basis.  *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 142 (3d Cir. 2004).

The FMLA provides an eligible employee with the statutory right to be reinstated to the same or an equivalent position when he returns from FMLA leave.  29 U.S.C. § 2614(a)(1).  The right to reinstatement is limited by the employee's ability to perform the "essential function[s]" of his position.  29 C.F.R. § 825.216(c).  An employer may require an employee to *prove* he is able to resume work, but only if it has advised him of this requirement in the designation notice. 29 C.F.R. §§ 825.300(d)(3); 825.312(b).  If an employer has successfully provided notice, and the employee is this required to prove fitness to return to work, the employer may require proof in the form of a certification to that effect from the employee's health care provider.  29 C.F.R. § 825.312(b).  The employer may even require that the certification state the employee is able to perform the essential functions of his job, but only if the designation notice so states and includes a list of the essential functions.  *Id.*  Lastly, a fitness-for-duty certification may be required if:

> the employer handbook or other written documents (if any) describing the employer's leave policies clearly provide that a fitness-for-duty certification will be required in specific circumstances (e.g., by stating that fitness for duty certification will be required in all cases of back injuries for employees in a certain occupation), the employer is not required to provide written notice . . . but must provide oral notice no later than with the designation notice.

29 C.F.R. § 825.300(d)(3).  Because employees do not have an absolute right to reinstatement,

"whether an employer violates the FMLA turns on why the employee was not reinstated."  *Kohls*

*v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 805 (7th Cir. 2001).

### b. Analysis

It is undisputed that the District did not provide Rutherford with any of the notices

required by § 825.300 and certainly did not provide him with a designation notice advising him

that it would not reinstate him without a fitness-for-duty certification.  Def.'s Mem. Opp. 41

("[T]he District failed to send Rutherford an FMLA notice of rights and responsibilities and

medical certification form and consequently, it did not send Rutherford any subsequent FMLA

designation notice or notice of its return-to-work procedures."); Dunn Dep. 37:6–9 ("My

understanding is that the forms were never completed, the formal forms for FMLA were never

completed."); Dunn Aff. ¶ 6; Ogden Dep. 16–24.

The District has presented no evidence its fitness-for-duty certification requirement was

imposed pursuant to a uniformly applied policy or practice of requiring certification,

§ 825.300(d)(3).  The District has produced only its one-page FMLA policy.  District FMLA

Procedures, ECF No. 73.  That policy does not address any fitness-for-duty certification

processes.  *Id.*  Nor does the Collective Bargaining Agreement address fitness-for-duty

certifications for the purposes of reinstatement.  *See* Collective Bargaining Agreement 8A.

Because of the District's failure to notify Rutherford of its requirements for proof of

fitness to return to work, Rutherford was not under any obligation to provide a fitness-for-duty

certification, or any other kind of proof, before he could exercise his right to be reinstated to his

position.  § 825.300(d)(3).  Rutherford needed only to be able to perform the "essential

functions" of his position, 29 C.F.R. § 825.216(c), and advise the District that he was able to

resume work.    On May 31, 2011, Rutherford received a doctor's note from Dr. Kube indicating

that he was fit to return to work, indicating that he could lift "50-100# max."[7]  May 31, 2011

Work Status Report.  Dr. Kube's report indicated that he "agree[d] with the findings of the

Functional Capacity Evaluation," which recommended Rutherford be released to work full-time

at "Full Duty."  FCE Report 2.  Dr. Kube's Progress Note from the appointment states that

Rutherford "should be able to [do things that fit his job description] and go back to his previous

job without difficulty." May 31, 2011 Progress Note 2, ECF No. 20-2 at 74.  The District has not

presented sufficient evidence to cast doubt on the fact that Rutherford was capable of returning

to work.[8]

Rutherford testified that he advised the District of his ability to return to work when he

delivered the note to Human Resources and Meyers' secretary on June 2, 2011; the District has

not presented sufficient evidence to dispute that he did so.[9]  It was then Rutherford's right to be

returned to work without delay.  § 825.312(b).  Instead, the District went ahead with scheduling a

fitness-for-duty evaluation, and conditioned his return to work upon its outcome.  Aug. 9. 2011

Dunn Email to Hammer, Meyers, Ogden ("Mr. Rutherford may not return to work until we have

---

[7] The District argues that the note was understood by the District to impose a fifty pound maximum on Rutherford's lifting abilities.  Def.'s Reply 4.  This is not a reasonable reading of the note, and the District provides no evidentiary support that any District employees interpreted the note in this manner.

[8] The District argues that Rutherford's Worker's Compensation filings—particularly his Demand for Vocational Rehabilitation Services, on August 3, 2011—should create a dispute of fact as to his ability to return to work because the claim stated that Rutherford had "permanent physical injuries" resulting in the District being "unwilling or unable to accommodate" the restrictions.  Def.'s Mem. Supp. Mot. Summ. J. 28.  Demand for Vocational Rehab. Svcs. ECF No. 74.  That testimony has no bearing on the information the District had at its disposal when it failed to reinstate Rutherford in June 2011.

[9] The District argues that it was not aware of Rutherford's medical release until August 2011.  Def.'s Mem. Supp. Disputed Material Facts ¶ 60.  Rutherford maintains that he hand-delivered Dr. Kube's note to Janet Ogden, telling her "Here's my paperwork so I can return to work."  Pl.'s Dep. 48:4–11.  As evidence that Rutherford did not bring in his doctor's note on June 2, 2011, the District points to the deposition testimony of Janet Ogden.  Def.'s Mem. Opp. Disputed Material Facts ¶ 90.  Ogden, in fact, testified that Rutherford had stopped in to the Human Resources office but "I don't know when."  Ogden Dep. 36:10–17.  The testimony does not constitute an affirmative denial that Rutherford came to the office to deliver his note; rather, simply that Ogden could not recall when he came in.  Therefore, the District has not provided sufficient evidence to dispute Rutherford's detailed account of delivering the note to the both Ogden and Meyers' secretary on June 2, 2011.  Pl.'s Dep. 47:4–12; 47:23–48:11.  Additionally, Hammer received Rutherford's Functional Capacity Evaluation, which released him to "Full Duty," no later than July 22, 2011; she passed it on to Human Resources at their request.  Hammer Dep. 54–55

had an opportunity to review the IWIRC fit for duty evaluation and make a determination as to his medical status.")  In her deposition, Dunn stated, "I think I would have probably looked back and now said I would have liked us to give them those forms, but I don't think that we treated him any differently because he didn't have the forms." Dunn Dep. 38:3–6.  But this is beside the point: it is precisely because the District failed to provide the FMLA forms that it was not entitled to request or require the information it did.  In light of the information possessed by the District as of June 2, 2011, the District's interference with Rutherford's right to return began then, and continued until the District ultimately terminated him.

Once a technical violation of the FMLA has been established—and here, the undisputed facts show that a violation occurred—the interference inquiry turns to whether the plaintiff experienced prejudice resulting from the violation.  *Ridings*, 537 F.3d at 764.  The District argues that Rutherford was not prejudiced by the District's lack of notice because he received all of the benefits he otherwise would have received had the leave been designated.  Def.'s Mem. Supp. 31; Dunn Dep. 37 (Dunn stated that while Rutherford was not given FMLA forms, he "was given all the rights and benefits as if [he] had been.")  This argument misses the mark in addressing Rutherford's real concern: that he was not returned to work once he had proven himself fit to do so.  Pl.'s Mem. 32.

Simply put, the District's failure to follow the FMLA notice rules, and thereby prolonging Rutherford's reinstatement process, prejudiced Rutherford because it kept him from returning to work despite the fact that he wanted to, was fit to do so, and was entitled to do so. *Cf. Ridings*, 537 F.3d. at 762 (holding, in the only Seventh Circuit case addressing prejudice in the context of failure to notice, that an employee was not prejudiced because she "benefitted from a reduced schedule [of] leave for more than a year" – a schedule she wanted to keep).  Even

though Rutherford was not required to prove his fitness to return to work, he had such proof—a note from his doctor stating that he was fit to work—and attempted to present it on June 2, 2011. *See Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 302 (4th Cir. 2016) (holding that sufficient evidence of prejudice existed where plaintiff would have structured leave differently, but employer had not provided notice of FMLA right to reinstatement).  Instead of reinstating him, the District kept Rutherford in limbo, and further delayed his return by wrongly requiring him to submit to a medical evaluation in contravention of § 825.312(b).  In doing so, it forced Rutherford to use his benefits, including all of his paid sick and vacation leave, which ended on August 20, 2011.  Def. Mem. Supp. SUMF ¶¶ 98-9**.**  *See* Nov. 4, 2011 Payroll Authorization, ECF No. 20-2 at 605.  Even when an employer has provided notification sufficient to request proof of fitness to return to work, the employer may not delay the employee's return to work while it seeks that proof.  § 825.312(b).

The Court finds that even when the facts are considered in the light most favorable to the District, it has not carried its burden to show the presence of a genuine dispute that it did not interfere with Rutherford's FMLA rights to notice and reinstatement.  Rutherford has presented sufficient evidence for the Court to find, as a matter of law, that the District interfered with his FMLA rights, and that he suffered prejudice as a result.

## II.  Timeliness of Claims

Rutherford filed his FMLA claim on January 20, 2014.  *See* Compl.  The District argues that the claim is untimely, at different times arguing that the last day the claim could have accrued was June 2, 2011, when Rutherford claims he delivered his clean bill of health to the District, Def.'s Mem.  22, or August 2011, when the District received a status report indicating that Rutherford was not still fit for duty.  Def.'s Reply 6, ECF No. 81.  Rutherford argues that the applicable date from which statute of limitations should be calculated is the time of his

termination, in the summer of 2013.  Pl.'s Resp. 43.  He further argues that in order to avoid violating the FMLA, the District should have reinstated him at any point between June 2, 2011 and August 2013. Though the Court adopts none of the parties' suggested dates of claim accrual, it finds, for the following reasons, that Rutherford's claim is timely.

### a.  Legal Standard

A claim may be brought for FMLA violations "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought."  29 U.S.C. § 2617(c)(1). The statute of limitations is extended to three years in the case of a "willful violation" of the statute.  *Id.* § 2617(c)(2).  In any event, the statutory text requires that the court determine the last event giving rise to a claim under the FMLA.  *Barrett,* 803 F.3d at 896.

### b.  Analysis

The District argues that Rutherford's case is foreclosed by the Seventh Circuit's decision in *Barrett v. Illinois Department of Corrections*.  *Barrett* held that the employer's denial of leave, whether issued in response to a prospective request or at a retrospective hearing, is the "last event" triggering the two-year statute of limitations.  *Barrett*, 803 F.3d at 896.

Though the District was not entitled to subject Rutherford to the reinstatement certification process laid out in the FMLA, it did so.  After reviewing medical records from Rutherford's own physicians, the District directed Rutherford to undergo another evaluation in August 2011.  *See* Aug. 9, 2011 Ogden Email to Dunn, ECF No. 54 ("It sounds like Mr. Rutherford's physician has released him with no restrictions . . . What is the next step, fitness for duty?").  Yet another evaluation was conducted on September 9, 2011, at the request of the District (though it is disputed as to who ordered the evaluation); the District received those results on September 29, 2011, via email from Cheryl Stenstrom to Geralyn Hammer, Ex. 39, ECF No. 59; Rutherford Dep. 66:17-67:8.  Rutherford was confused by his employment status.

13

Pl.'s Dep. 69:3 – 7 (explaining the reason for his filing of a December 2011 Labor Relations Board complaint, he said "I was trying to find out why I hadn't been returned to work. I did everything I was instructed to do and no – I wasn't back at work.").  So was the District: questions about Rutherford's employment status bounced around the District's Human Resources department for many months, well into 2012 and 2013.  *See* Ogden Dep. 32–34; 42:11-19.  Meanwhile, District officials refused to communicate directly with Rutherford regarding his employment status because of the ongoing litigation.  Hammer Dep. 66:11–22; Jul. 24, 2012 Hammer Email to Dunn, ECF No. 20-2 at 612 ("Kenneth has an attorney which means none of us should talk with him.")

Because of the protracted nature of the reinstatement process, the date from which Rutherford's claim accrued should be the date in July 2013 in which the District notified him via letter—mailed on July 30, 2013—that he "abandoned" his job.  ECF No. 20-3 at 25–27.  It was only at this point that Rutherford knew definitively that his status had been re-classified by the District, that the District did not plan to reinstate him, and that his "FMLA rights were impaired and [he] suffered prejudice" sufficient to merit legal action.  *Barrett*, 803 F.3d at 897.  No other event in the reinstatement process reasonably could be considered the "last event" for the purpose of claim accrual.[10]  Surely, the statute of limitations cannot run against a plaintiff as the employer continues, however slowly, to follow what it believed to be its own reinstatement procedure.

---

[10] For this reason, *Barrett* is not dispositive here.  When an employee brings suit for improper denial of leave, it is relatively straightforward to pinpoint the exact date at which the claim accrued—that is, when the leave was denied.  *See Barrett*, 803 F.3d at 897.  Barrett was explicitly denied FMLA leave by an employee review board on three separate occasions, and because her workplace utilized a progressive discipline policy, all three instances occurred five years or more before her eventual firing in 2010.  Each review board hearing, the Seventh Circuit found, was a "discrete act" that triggered the two-year limitations period as its own violation of the FMLA.  *Barrett*, 803 F.3d at 899.

For the foregoing reasons, the Court finds that the last event constituting the alleged violation for which this claim was brought was the District's communication to Rutherford, in July 2013, of its decision not to reinstate him to his position.  This brings Rutherford's claim well within the two-year limitations period, creating no need for the Court to analyze the willfulness of the District's behavior.  As a matter of law, the statute of limitations does not bar Rutherford from pursuing the claim.

## CONCLUSION

Plaintiff's Motion for Partial Summary Judgment, ECF No. 19, is GRANTED. Defendant's Motion for Summary Judgment, ECF No. 21, is DENIED.  Remaining for trial is the question of what, if any, damages and/or other relief Rutherford is entitled to receive as a result of the District's FMLA interference.

Entered January 13, 2017.

s/ Sara Darrow
_____
SARA DARROW
UNITED STATES DISTRICT JUDGE
